UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVELYN ESSA<br>Plaintiff,<br><br>v.<br><br>GENZYME CORPORATION,<br>Defendants. | )<br>)<br>) Docket No. 18-CV-12653<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT – JURY TRIAL DEMAND

### INTRODUCTION

1. This is an action for, inter alia, age discrimination in employment, pursuant to 29 U.S.C. §§ 621 et seq., and for wrongful termination in violation of public policy and the common law.

### PARTIES

2. The Plaintiff, Evelyn Essa ("Essa"), is a natural person and New Hampshire resident, with a residential address of 195 McGregor Street, Apt. 217, in Manchester, New Hampshire 03102.

3. The Defendant, Genzyme Corporation ("Genzyme"), is a Massachusetts corporation with a headquarters and principal place of business at 50 Binney Street, Cambridge, MA 02142.

### JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the ADEA claim pursuant to 29 U.S.C. §§ 621 et seq. presents a federal question.

5. This Court has jurisdiction over the remaining claims pursuant to: a) 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and there exists complete diversity as

between the plaintiff and the defendant; and/or b) 28 U.S.C. § 1367 which provides supplemental jurisdiction for claims asserted alongside the Federal claim.

6. This Court has personal jurisdiction over the defendant as the defendant's principal place of business is in Cambridge, Massachusetts.

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the defendant's principal place of business is in Cambridge, Massachusetts.

8. On or about March 9, 2017, the plaintiff presented the age discrimination in employment claims to the Equal Employment Opportunity Commission, and the New Hampshire Human Rights Commission. The plaintiff received a so-called Right-to-Sue letter on October 10, 2018, and this Complaint is filed within ninety (90) days thereof.

## FACTS COMMON TO ALL COUNTS

9. On December 2, 2013, Essa started work for Genzyme in the Southern Arizona area as a full-time Senior Area Business Manager ("SABM"), a pharmaceutical sales representative position.

10. Prior to working for Genzyme, Essa had over 20 years of experience as a very successful pharmaceutical sales representative.

11. Generally, Essa's position at Genzyme, in both Arizona and New Hampshire, involved pharmaceutical sales relative to Genzyme's multiple sclerosis ("MS") pharmaceutical products. Specifically, Essa would educate physicians and other health care providers on Genzyme's MS medications, facilitate patient education programs, and perform other tasks related to the sales of such medications.

12. In or around December 2014, Essa requested a transfer to be based in New Hampshire.

13. Essa spoke by phone with New Hampshire Regional Business Director Ryan Emerson ("Emerson") regarding the transfer, and was approved for a new territory which covered most of New Hampshire and part of Massachusetts. Emerson and Essa did not meet in person before the transfer.

14. Prior to transferring, Essa had excellent and unwaveringly positive job performance reviews, including being ranked 15th in the nation for sales for 2014; and her 2014 review noting: "Lynne, you have defined what it takes to be successful at Genzyme…. You have delivered 100% on your reputation for sales excellence."

15. On or about January 1, 2015, Essa started work in her new territory, with the same job and job responsibilities, however with Emerson as her direct supervisor. Essa's new territory covered most of New Hampshire and part of Massachusetts.

16. Essa continued high performance in her new territory, and as of her review, was ranked #4 in the country, with 2015 being her first year in the new territory; and completing the most number of professional programs seen by management.

17. However, in or around March of 2015, Emerson started a dispute with Wayne Twitchell, the president of the Multiple Sclerosis Encouragement Organization ("MSEO").

18. Essa ran a substantial percentage of her patient programs through MSEO and with Mr. Twitchell, and had worked with Mr. Twitchell for years. Mr. Twitchell came from Arizona to New England to work with Essa, and these patient programs were essential to Essa's continued job performance, a substantial part of her job, and a benefit to Genzyme.

19. Generally, in his communications with Mr. Twitchell, including a March 21, 2015 email, Emerson was seeking control over the patient programs, and seeking to bar MSEO from running ongoing programs with patients, or working with other pharmaceutical providers

3

other than Genzyme. Upon information and belief, Emerson sought to channel the patient programs (and patients) through him, and through Genzyme, so that he and Genzyme could personally benefit.

20. Moreover, Mr. Emerson requested on multiple occasions that he and Genzyme receive RSVPs directly from patients for MSEOs patient programs, and/or carbon copies of RSVPs - in any case such that Emerson and Genzyme could see the names of the patients.

21. Where there was no specific patient permission to release their name (and participation status, and therefore status as a patient with MS), such request, and such release to Emerson and Genzyme, would violate HIPAA laws, the common law as to privacy and patient confidentiality, general patient privacy concerns, and, upon information and belief, Genzyme's own policies with respect to confidentiality.

22. Emerson also requested patient lists and patient databaseds from Mr. Twitchell and MSEO, raising the same confidentiality concerns.

23. Mr. Twitchell refused Mr. Emerson's requests, and filed a complaint as against Emerson.

24. Essa also filed an internal complaint with Genzyme as against Emerson, for the issues regarding patient confidentiality and attempting to circumvent MSEO.

25. Upon information and belief, Genzyme took no action on these complaints.

26. Moreover, in or around April 2015, after this dispute arose, Essa was scheduled to attend Genzyme's Circle of Excellence event as one of the top 15 performers in the company. Emerson told Essa not to bother to go.

27. Essa learned that she had tied another Area Business Manager for best performer but the other person was presented the top award at the Circle of Excellence event.

28. Emerson would not tell Essa why she did not share the award.

29. Essa requested an explanation from Genzyme's Human Resources Department, but did not receive a response.

30. In or around May 2016, Emerson claimed another employee had informed him that Essa said she could wait to retire.  Essa had never made any such statement, or any statement regarding retirement.

31. In or around May of 2016, upon information and belief, Emerson had an Ambassador from VPR Patient Outreach Programs ("VPRPOP") named Laurie Jewer file a negative review of one of Essa's patient programs where MSEO and Mr. Twitchell were running the program (the "Jewer Review").  The Jewer Review was negative regarding Essa, and negative regarding MSEO and Twitchell.  Upon information and belief, Emerson actually authored and dictated the Jewer Review himself, in part or whole.

32. Upon information and belief, VPRPOP would also benefit financially if MSEO were no longer used by Genzyme.

33. Seven other reviews for Essa's programs were exceedingly positive.

34. However, on or about May 24, 2016, Emerson requested a meeting with Essa, for June 1, 2016.  The meeting occurred on June 1, 2016.  Emerson reviewed and showed the Jewer Review with Essa; however refused to provide a copy of the Jewer Review to Essa, or inform Essa with whom he shared the Jewer Review.  Upon Essa leaving for the restroom, Emerson deleted portions of the  e-mail.

35. Upon information and belief, the Jewer Review was shared with Genzyme management in charge of Essa's division.

36. Immediately thereafter, Emerson requested additional feedback from VPRPOP regarding Ms. Essa and Mr. Twitchell.

37. Over the course of June 6, 2016, Emerson texted Essa multiple times, and set up meeting times that he knew conflicted with her patient programs that day.

38. On the same day, June 6, 2016, at approximately 4:30, Essa was taken to the emergency room for overnight cardiac observation.

39. On June 7, 2016, Essa began short-term disability leave.

40. Emerson continued to text and call Essa on her personal phone, until Essa requested through Human Resources that he stop.

41. On June 13, 2016, Emerson again reached out to Twitchell to affirm that he could only work with Essa, and again request patient lists, and that Essa was out on medical leave.

42. On July 2016, Emerson again told Twitchell that Essa was out on medical leave, assumed that she was not going to return, and that they would be not continue meetings after October.

43. At or around the same time, Emerson asked Twitchell if he knew Essa's age. Emerson told Twitchell that due to Essa's age, she would not be returning to work from her disability leave.

44. In or around July 2016, Essa learned her work territory assignment was listed as vacant while she was on leave.

45. In or around September and October 2016, Essa learned that Emerson had cancelled several programs Essa had set up with clients for her return to work.

46. Cancellation of the programs would seriously impair Essa's ability to complete and excel at her work upon her return.

47. On or about September 26, 2016, Essa reported her issues with Emerson to David Ford, Head of Human Resources.

48. Maya McLean ("McLean"), Manager of Employee Relations, responded and requested Essa schedule a time to meet regarding the issue.

49. Essa provided a date and time to meet, namely November 18, 2016.

50. McLean never responded.

51. Essa was cleared to return to work in December 2016.

52. On or about January 3, 2017, as a direct and proximate result of the continued harassment and discrimination from Emerson, and the negative impact of stress, and the failure of action on the part of Genzyme through her anticipated return date of January 2, 2017, Essa terminated her employment with Genzyme.

53. Emerson's continuing harassment of and discrimination against Essa was due to Emerson's perception of Essa's age, and alternatively in retaliation for the reports she made about his efforts to obtain confidential patient data.

54. Emerson's continued harassment of and discrimination against Essa, and Genzyme's failure to address the same, or create a plan for her reentry on January 3, 2017, had a detrimental effect on Essa's health.

55. At the time she terminated her employment, Essa was 66 years old.

56. Throughout Essa's tenure at Genzyme, her work performance was ranked as excellent; except after Emerson learned of her age and her complaints.

57. But for the harassment and the work environment caused by the harassment, and Genzyme's failure to address the same, Essa would have enjoyed working for at least two more years.

58. At all times relevant, Genzyme had over 6 employees.

## CAUSES OF ACTION

### Count I – Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.

59. Essa repeats and realleges the previous paragraphs as if fully outlined herein.

60. Essa had a very successful career before and with Genyzme as a pharmaceutical sales representative.

61. The subjection of plaintiff to disparate treatment and adverse employment actions by defendants because of her age was in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.

62. Defendant's violation of the ADEA was willful and plaintiff seeks liquidated damages for each violation.

63. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of her civil rights and actions violative of the ADEA as alleged herein. Plaintiff is reasonably certain to continue to suffer such damages in the future.

64. Plaintiff is entitled to the rights and remedies at law provided by the ADEA, 29 U.S.C. § 216(b), including an award against the defendant of actual damages, compensatory damages, liquidated damages, and attorneys' fees and costs.

### Count II – Violation of the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B

65. Essa repeats and realleges the previous paragraphs as if fully outlined herein.

66. The subjection of plaintiff to disparate treatment and adverse employment actions by defendants because of her age was in violation of the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B ("FEPA").

67. Defendant's violation of the FEPA was willful and plaintiff seeks liquidated damages for each violation.

68. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of her civil rights and actions violative of the FEPA as alleged herein.  Plaintiff is reasonably certain to continue to suffer such damages in the future.

69. Plaintiff is entitled to the rights and remedies at law provided by the FEPA, including an award against the defendant of actual damages, compensatory damages, liquidated damages, punitive damages, and attorneys' fees and costs.

**Count III – Violation of the New Hampshire Law against Discrimination, N.H.R.S.A. § 354-A:1 et seq.**

1. Essa repeats and realleges the previous paragraphs as if fully outlined herein.

2. The subjection of plaintiff to disparate treatment and adverse employment actions by defendants because of her age was in violation of the New Hampshire Law against Discrimination, N.H.R.S.A. § 354-A:1 et seq. ("NHLAD").

3. Defendant's violation of the NHLAD was willful and plaintiff seeks liquidated damages for each violation.

4. Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of her civil rights and actions violative of the NHLAD as alleged herein. Plaintiff is reasonably certain to continue to suffer such damages in the future.

5. Plaintiff is entitled to the rights and remedies at law provided by the NHLAD, including an award against the defendant of actual damages, compensatory damages, liquidated damages, punitive damages, and attorneys' fees and costs.

### **Count IV – Wrongful and Constructive Termination**

6. Essa repeats and realleges the previous paragraphs as if fully outlined herein.

7. Essa had a very successful career with Genyzme, and before Genzyme.

8. The common law of New Hampshire and/or Massachusetts prohibit an employer from retaliating or discriminating against an employee for reporting or opposing practices prohibited or forbidden by law, including practices or attempted practices violative of HIPAA and patient confidentiality.

9. Public policy would have, and does, encourage Essa to oppose and report violations and attempted violations of patient confidentiality.

10. The actions of Genzyme and Emerson as outlined herein with respect to Essa during her employment, including the hostile work environment to which Essa was subjected over the course the course of her entire employment, and the retaliation relative to her complaints regarding attempted breaches of patient confidentiality, all are violative of public policy and this common law of Massachusetts and/or New Hampshire.

11. The hostile work conditions, and course of retaliative conduct, were sufficiently ongoing, pervasive and severe, and the response by management so non-existent, that reasonable employee would have felt forced to resign from the position, as Essa did.

12. The adverse employment actions of Genzyme and Emerson, including retaliation and other acts described herein, were motivated by bad faith, retaliation, and/or malice.

13. As a direct and proximate result of Genzyme's wrongful inaction to Essa's complaints of harassment and attempts to subvert patient confidentiality, and the other acts of Genzyme and Emerson as described herein, Essa has been caused to suffer damages.

14. Essa is entitled to an award against the defendant of her actual and compensatory damages.

## DEMAND FOR JURY TRIAL

The Plaintiff respectfully request a trial by jury on all counts and issues so triable.

Respectfully submitted,
The Plaintiff,
EVELYN ESSA,
By her attorneys,

COOPER CARGILL CHANT, P.A.

Dated: 12/28/2018

By: /s/ Christopher T. Meier
Christopher Meier, MA BBO# 640995
2935 White Mountain Highway
North Conway, New Hampshire 03860
Tel:   (603) 356-5439
Fax:   (603) 356-7975
Email: cmeier@coopercargillchant.com

Y:\CLIENT FILES\19959 - Essa\.001 v. Genzyme\Pleadings - MA Court\Complaint - Final - D.Mass..docx